**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Robinson, | No. CV-22-00943-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Maricopa County Special Health Care District, | |
| Defendant. | |

Pending before the Court is Plaintiff's motion for conditional certification of a collective action under the Fair Labor Standards Act ("FLSA").  (Doc. 33.)  For the following reasons, the motion is granted.

**BACKGROUND**

On June 1, 2022, Plaintiff initiated this action.  (Doc. 1.)

On February 21, 2023, after a series of amendments, Plaintiff filed her operative pleading, the third amended complaint ("TAC").  (Doc. 31.)

The TAC alleges as follows.  From October 2021 to February 2022, Plaintiff was employed by Defendant Maricopa County Special Health Care District d/b/a Valleywise Health.  (*Id.* ¶ 16.)  Defendant uses timekeeping software and hardware operated and maintained by a nonparty entity called Kronos.  (*Id.* ¶ 35.)  "On or about December 11, 2021, Kronos suffered a disruption in service due to a ransomware attack," causing a "service outage" that affected Defendant and "many other organizations across the United States."  (*Id.* ¶¶ 1, 36.)  "For at least a portion of time following the Kronos outage,

[Defendant] failed to keep accurate track of the hours" worked by Plaintiff and other employees and instead "estimated the number of hours" worked, including by "duplicat[ing] paychecks from pay periods prior to the Kronos outage." (*Id.* ¶¶ 38-40.) "As a result of [Defendant's] failure to accurately track the actual hours worked each week, employees who were non-exempt," including Plaintiff, "were in many cases paid less than the hours they worked in the workweek, resulting in a failure to pay minimum wages and/or overtime hours." (*Id.* ¶¶ 41-44.) "Instead of paying [Plaintiff] for the hours she actually worked, including minimum wages, [Defendant] simply paid based on estimates of time or pay, or based upon arbitrary considerations other than [Plaintiff's] actual hours worked and regular pay rates, in multiple workweeks." (*Id.* ¶ 45, emphasis omitted.) Plaintiff alleges that "[i]t was feasible" for Defendant to "have its employees and managers report accurate hours so they could be timely paid the full and correct amounts of money they were owed," but Defendant "chose not to do that." (*Id.* ¶¶ 56-57.)

On the same day she filed the TAC, Plaintiff filed the pending motion for conditional certification. (Doc. 33.) There, Plaintiff asserts that Defendant "claims it found out about the outage on December 12, 2021, and had its access to Kronos restored on January 19, 2022," such that "the outage affected at least three pay periods"—the pay period beginning November 28, 2021 (PP #25), the pay period beginning December 12, 2021 (PP #26), and the pay period beginning December 26, 2021 (PP #1). (*Id.* at 2.) Plaintiff further asserts that Defendant "adopted uniform policies" as to how to handle paying its employees during the outage. (*Id.*) Specifically, Defendant "took the preceding pay period, PP #24, which began on November 14, 2021, and contained the Thanksgiving holiday, and duplicated it for at least each of pay periods numbered 25 and 26," even though Defendant "knew and acknowledged that the amounts that workers were paid 'may not be reflective of the actual work performed during [each] pay period.'" (*Id.* at 2-3.) Plaintiff further asserts that Defendant promised that once Kronos was able to provide data for hours worked during the service outage, Defendant would "pay what [they] have underpaid" by September 30, 2022—many months after the pay periods at issue. (*Id.* at 3.)

On March 7, 2023, Defendant filed an answer to the TAC.  (Doc. 38.)  In its answer, Defendant states, *inter alia*, that it "used alternative methods other than Kronos-based systems to accurately determine the number of hours and wages for its employees during the Kronos outage including, but not limited to, using prior pay periods to estimate hours and wages" and adds that it "requir[ed] employees to manually track and submit any additional hours that the employees worked."  (*Id.* ¶ 40.)

On March 14, 2023, Defendant filed a response opposing Plaintiff's motion for conditional certification.  (Doc. 39.)

On March 28, 2023, Plaintiff filed a reply.  (Doc. 45.)

On August 9, 2023, Plaintiff submitted a notice of supplemental authority, attaching a decision from the Western District of Arkansas that was issued after the conditional certification motion became fully briefed.  (Doc. 52.)

On August 14, 2023, Defendant filed a response to the notice of supplemental authority.  (Doc. 53.)

On September 27, 2023, the Court issued a tentative decision.  (Doc. 55.)

On September 29, 2023, the Court heard oral argument.  (Doc. 56.)

## DISCUSSION

I.   <u>Legal Standard</u>

The FLSA provides "similarly situated" employees with the "right" to bring a collective action against their employer:

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. . . .  The right . . . to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor . . . .

29 U.S.C. § 216(b).

The seminal Ninth Circuit case regarding FLSA collective actions is *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018).  In *Campbell*, the Ninth Circuit

explained that, under § 216(b), "workers may litigate jointly if they (1) claim a violation of the FLSA, (2) are 'similarly situated,' and (3) affirmatively opt in to the joint litigation, in writing." *Id.* at 1100.  The court further explained that this right "has two permutations": (1) "[t]he right . . . to bring an action by or on behalf of any employee"; and (2) "the right of any employee to become a party plaintiff to any such action"—"that is, the right to bring the collective litigation and the right to join it." *Id.*

Turning to the procedures and standards governing FLSA collective actions, the *Campbell* court noted that a judicially-crafted "two-step 'certification' process" had become "near-universal" and therefore chose to "adhere" to the terms "preliminary certification" and "decertification" in the FLSA context because they are "widespread," with the caveat that adherence to this terminology does not "imply that there should be any particular procedural parallels between collective and class actions." *Id.* at 1100-02.  The court further clarified that, under the two-step certification process, "plaintiffs will, at some point around the pleading stage, move for 'preliminary certification' of the collective action, contending that they have at least facially satisfied the 'similarly situated' requirement," and then "[l]ater, after the necessary discovery is complete, defendants will move for 'decertification' of the collective action on the theory that the plaintiffs' status as 'similarly situated' was not borne out by the fully developed record." *Id.* at 1100. Although the court acknowledged that both steps involve evaluating whether the plaintiffs are "similarly situated," it emphasized that courts apply different standards at each step:

> Preliminary certification, as noted, refers to the dissemination of notice to putative collective members, conditioned on a preliminary determination that the collective as defined in the complaint satisfies the "similarly situated" requirement of section 216(b).  At this early stage of the litigation, the district court's analysis is typically focused on a review of the pleadings but may sometimes be supplemented by declarations or limited other evidence.  The level of consideration is "lenient"—sometimes articulated as requiring "substantial allegations," sometimes as turning on a "reasonable basis," but in any event loosely akin to a plausibility standard, commensurate with the stage of the proceedings.

> [ . . . ]

> Assuming the collective action has survived its earlier scrutiny, the second stage will come at or after the close of relevant discovery.  The employer can move for "decertification" of the collective action for failure to satisfy the

> "similarly situated" requirement in light of the evidence produced to that point.  The district court will then take a more exacting look at the plaintiffs' allegations and the record.  Because of its purpose and timing, decertification can resemble a motion for partial summary judgment on the "similarly situated" question, and may be combined with cross-motions for summary judgment.

*Id.* at 1109-10 (cleaned up).  The court noted that "the two-step process . . . has the advantage of ensuring early notice of plausible collective actions, then eliminating those whose promise is not borne out by the record." *Id.* at 1110.

In *Campbell*, a decertification motion was at issue, so the "more exacting" summary-judgment-like standard applied, as opposed to the "lenient" plausibility-like standard that applies to a conditional certification motion.  Nevertheless, because certification and decertification motions both ask the district court to consider whether the plaintiffs are "similarly situated," the discussion in *Campbell* of the meaning of that statutory term is relevant for both steps in the two-step process.

*Campbell* rejected the two prevailing approaches to the "similarly situated" requirement that had emerged up to that point.  The first rejected approach, dubbed the "minority approach," would require FLSA collectives "to satisfy the [Rule 23] requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority." *Id.* at 1111.  The court concluded that this approach was flawed because it "rests improperly on an analogy to Rule 23 lacking in support in either the FLSA or the Federal Rules of Civil Procedure," imports "rules specific to class actions [which] have evolved to protect the due process rights of absent class members, a consideration not pertinent under the post-1947 FLSA," and fails to take into account the "lower bar" for FLSA collective actions, to which employees have a statutory "right." *Id.* at 1112-13.  The second rejected approach, dubbed the "majority approach" or "ad hoc test," would require district courts to "appl[y] a three-prong test that focuses on points of potential factual or legal *dissimilarity* between party plaintiffs" by first considering the "disparate factual and employment settings of the individual plaintiffs," then considering the "various defenses available to defendants which appear to be individual to each plaintiff," and finally

considering "fairness and procedural considerations." *Id.* at 1113.  The court identified "two major flaws" with this approach: (1) it "offers no clue as to what *kinds* of 'similarity' matter under the FLSA," such that "[i]t is, in effect, a balancing test with no fulcrum"; and (2) the "fairness and procedural considerations" prong "invites courts to import, through a back door, requirements with no application to the FLSA—for example, the Rule 23(b)(3) requirements of adequacy of representation, superiority of the group litigation mechanism, or predominance of common questions." *Id.* at 1114-15.

Having rejected both prevailing approaches, the Court articulated the following definition of "similarly situated" that courts within the Ninth Circuit must employ:

> [P]arty plaintiffs must be alike with regard to some *material* aspect of their litigation.  That is, the FLSA requires similarity of the kind that allows plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.  That goal is only achieved—and, therefore, a collective can only be maintained—to the extent party plaintiffs are alike in ways that matter to the disposition of their FLSA claims.  If the party plaintiffs' factual or legal similarities *are* material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment.

*Id.* at 1114 (cleaned up).  Put another way, "[p]arty plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id.* at 1117.  "[D]ifference" is not "disqualifying"—rather, "the requisite kind of similarity" is the "basis for allowing partially distinct cases to proceed together." *Id.*

Under this definition, the members of an FLSA collective do not need to have "overall sameness." *Id.* at 1116.  For example, in *Campbell*, it was enough for the plaintiffs to demonstrate that they were subject to the same "overall policy" regardless of whether they "worked on different tasks, in different divisions, and under different supervisors" because "[a] systemic policy is no less common across the collective if those subject to it are affected at different times, at different places, in different ways, or to different degrees." *Id.*  In that case, "[t]he district court emphasized also that the [plaintiffs] worked different hours and claimed overtime of different amounts, including some amounts that might have been de minimis," but the Ninth Circuit stated that "those distinctions go to the

individualized calculation of damages or the individualized application of defenses" and "do not preclude collective treatment for the purpose of resolving the common issue that *does* exist, and that must be answered in the first instance." *Id.* The court elaborated that "individualized damages calculations" are not "inherently inconsistent with a collective action" because "if a common question regarding the employer's liability is answered in the plaintiffs' favor, individualized calculations of work hours may readily be addressed with any of the practices developed to deal with Rule 23 classes facing similar issues." *Id.* Considering that the "amount of damages is invariably an individual question and does not defeat class action treatment" in the Rule 23 context, the court held that "[i]ndividual damages amounts cannot defeat collective treatment under the more forgiving standard of section 216(b) either." *Id.* at 1117.

Finally, the court clarified that "the FLSA does not give district courts discretion to reject collectives that meet the statute's few, enumerated requirements." *Id.* at 1115. "As is true in all FLSA cases," the "background principle" is that "because the FLSA is a remedial statute, it must be interpreted broadly." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 950 (9th Cir. 2019) (citation omitted). "The 'similarly situated' standard at [the conditional certification] phase is fairly lenient and typically results in certification." *Roberts v. Sidwell Air Freight Inc.*, 2022 WL 16949565, *8 (W.D. Wash. 2022) (quotation omitted).

II.    The Parties' Arguments

Plaintiff argues that conditional certification is warranted because "[Defendant's] non-exempt employees were subject to the same time, pay, and accounting practices as a result of [Defendant's] uniform response to the Kronos outage," through which "[a]ll these employees were initially paid based on time estimates, leading to underpayment of wages (including minimum and overtime wages), due to the defective corporate policies and procedures put in place to handle employee timekeeping and payroll." (Doc. 33 at 4.)

In support of these assertions, Plaintiff proffers several pieces of evidence.[1] As

---

[1]    These pieces of evidence were not summarized in the tentative ruling. The Court

relevant here, one of those pieces of evidence is a declaration from Plaintiff, who verifies many of the factual allegations in the TAC while also adding some additional details. (Doc. 33-1.) For example, Plaintiff provides more detail as to why Defendant's challenged practices caused her to receive less-than-minimum wages, in violation of the FSLA, during at least one of the pay periods at issue:

> During pay period #24, which is the pay period before the outage began, I worked less time due to the Thanksgiving holidays. During pay period #24, I was paid $153.19 for 3.85 hours of work, which, as far as I can tell, was paid at my correct rates of pay. I then returned to normal hours after, including pay periods #25 and #26. Because [Defendant] used pay period #24 to estimate my pay during pay periods #25 and 26, my pay was below the hours I actually worked for [Defendant] for those pay periods. For example, during pay period #25, I worked 23 hours, but I was paid a total of only $153.19, which is only $6.66 per hour.

(*Id.* ¶¶ 12-15.) Additionally, in an attempt to show that other non-exempt employees received less-than-minimum wages and/or did not receive overtime wages, Plaintiff makes the following statement:

> Based on discussions with my co-workers, my familiarity with [Defendant's] pay practices, and my observations and experiences, I know that most or all other nonexempt employees for [Defendant] who had to use the Kronos system had the same problems being timely and fully paid for the work we did, including minimum wage and overtime compensation, because [Defendant] used the period before the outage to pay for hours during the outage, even where we worked many more hours during the outage than we did in the pay period immediately preceding the outage.

(*Id.* ¶ 16.)

Another of Plaintiff's proffered pieces of evidence is a December 28, 2021 presentation by Defendant entitled "Valleywise Health KRONOS Update." (Doc. 33-3.) Among other things, this presentation states that "Payroll for pay periods #25 and #26 were based on pay period #24," explains that "[i]f the employee believes that they worked more in PP#25 or PP#26 than they did in PP#24, they should report the difference on [a] Payroll

adds them here in an effort to address some of the points raised during oral argument.

Adjustment Form," and further explains that "[d]ue to the volume of Forms received, they are being completed in order based on date of receipt and pay period, with an email to the employee when the check is ready." (*Id.* at 5.)

Finally, another of Plaintiff's proffered pieces of evidence is a document entitled "Kronos Frequently Asked Questions." (Doc. 33-4.) It includes the following description of Defendant's post-outage payroll process: "Payroll for 12/17 will be made on time and will be the same amount that was paid on the 12/03 paycheck. As a result, the amounts may not be reflective of the actual work performed during this pay period. Any potential underpayments encountered by the employee will be addressed promptly while we also reserve the right to recoup any overpayments." (*Id.* at 1.)[2]

In its opposition brief, Defendant uses lengthy "introduction" and "background" sections to set forth various supplemental facts not alleged in the TAC or mentioned in Plaintiff's motion for conditional certification. (Doc. 39 at 1-6.) Defendant states that it "paid nearly half of its employees in full, on time" during the Kronos outage—specifically, 47% of its workforce was timely paid in full. (*Id.* at 1-2.) Defendant also states that the employees who were not timely paid in full were at fault—they "did not report [their hours] timely, fully, and accurately" by using a "manual reporting system" that Defendant "immediately implemented" following the Kronos outage. (*Id.* at 1.) Defendant concedes that it used the amount paid for the pay period preceding the outage—pay period #24— and duplicated that amount as a means of estimating payments owed during the outage, "understanding that in some cases manual adjustments would be needed." (*Id.* at 3-4.) However, Defendant further explains that it "[a]nticipat[ed] that replicating pay period 24 across periods 25, 26, and 1 might leave some employees underpaid if they worked more hours or different shifts and assignments" and therefore "set up a process" in which employees who "believed that they were or would be underpaid for a pay period affected

---

[2]    A similar statement appears in another of Plaintiff's proffered exhibits, which is a summary of a "Q&A from Valleywise Health manager meeting 12/16/2021": "When we get our data back from Kronos, all of this is going to be reconciled and if we have overpaid or underpaid somebody, we're going to pay what we have underpaid. If we have overpaid, we will recoup that also." (Doc. 33-5 at 2.)

by the outage" were instructed to "submit payroll-adjustment requests" through an internal system named "Service Now." (*Id.* at 4.) Defendant asserts it processed the payroll-adjustment requests (dubbed "SNOW tickets") "as fast as it could as they came in." (*Id.*) Defendant states that "it was impossible . . . to process all the SNOW tickets associated with a given pay period during that period." (*Id.*) However, Defendant attributes the delay to its employees' failure to promptly submit their payroll-adjustment requests: "not all employees took advantage of the system, or [they] chose to submit at random times, often after the pay date for the period had passed." (*Id.*)

Defendant also emphasizes that this system (duplicating pay period #24 and asking employees to submit payroll-adjustment requests) did not apply to "new employees who started after pay period 24," such that Defendant "had to devise a separate system" for them "because there was no data to replicate," so they were paid "their full time equivalent and base rate." (*Id.* at 5.) In any event, Defendant asserts that once it had access to the data from the outage, it was "eventually able to use that data to distribute any payments that still needed to be made for employees who chose not to submit SNOW tickets or who had done so inaccurately," although this process "took several months because Kronos' assistance was needed but not timely received." (*Id.*) Defendant states that "[i]n the end . . . every employee was paid in full" and adds that "to show appreciation for employees' patience, [Defendant] issued $500 bonuses to everyone who was not already overpaid by at least that amount." (*Id.* at 6.)

Defendant submits several pieces of evidence in support of its opposition brief. As relevant here, one of those pieces of evidence is a declaration from Matthew Meier, Defendant's vice president of financial services. (Doc. 39-1.) Meier acknowledges that Defendant "was aware that duplicating pay period 24 would result in some employees being overpaid and others being underpaid in the impacted pay period." (*Id.* ¶ 7.) Meier adds: "Not all underpaid employees chose to submit SNOW tickets and others submitted them too late to be processed before the payday for a pay period." (*Id.*   ¶ 10.)

Against this backdrop, Defendant offers four reasons why the Court should not

conditionally certify the collective: (1) "Plaintiff fails to allege a single FLSA-violating policy"; (2) "Plaintiff fails to submit sufficient evidence that she is similarly situated to other members of the prospective collective"; (3) "factual and legal issues unique to each employee make proceeding as a collective infeasible"; and (4) "[t]he only case to address this specific issue supports [Defendant]." (*Id.* at 7-14.)

In reply, Plaintiff does not dispute Defendant's supplemental facts. Regarding Defendant's first argument, Plaintiff contends that Defendant "made several decisions regarding how and when it would pay its non-exempt employees that it applied uniformly" and that "[t]hese company-wide pay policies—in particular, the decisions to estimate hours worked by duplicating prior pay periods and to combine workweeks in an attempt to reconcile employees' net pay at the end of the outage—violate the FLSA and bind the proposed collective as similarly situated." (Doc. 45 at 1.) Plaintiff emphasizes that Defendant has now admitted that (1) it duplicated a prior pay period to create "estimated" payrolls, (2) it knew this would result in underpayment, (3) only 47% of its employees were timely paid in full, and (4) its reconciliation process for underpaid employees took months. (*Id.* at 2.)[3] Plaintiff contends that "[e]ven if any of [Defendant's] alleged defenses held water (and they don't), they are all merits-based arguments. At this stage, it is improper to evaluate the merits of FLSA claims or defenses. These are, by their nature, strictly second stage considerations and should not be considered at this time." (*Id.* at 4.) Regarding Defendant's second argument, Plaintiff asserts that she is not required to submit evidence in the form of "some minimum number of declarations" and, at any rate, her evidence has now been "buttressed by [Defendant's] own testimony and evidence." (*Id.* at 7.) Regarding Defendant's third argument, Plaintiff argues that "individual damages do not prevent certification." (*Id.* at 4.) Regarding Defendant's fourth argument, Plaintiff discusses the status of the various "Kronos outage wage-and-hour cases" and highlights

_____

[3]     Plaintiff also asserts that Defendant conceded that it "failed to ensure that all employees were ever paid for the work they performed" and that Defendant "aggregated employee pay data across the entire payroll outage instead of determining amounts owed to employees on a week-by-week basis" (Doc. 45 at 2), but the Court does not agree that Defendant conceded these points.

that of the various cases, "[o]nly one other employer has thus far taken up the parties' and the Court's resources by contesting conditional certification" and that employer lost.  (*Id.* at 5-6.)

III.   <u>Analysis</u>

Plaintiff seeks to conditionally certify a collective of similarly situated workers ("FLSA Collective members") composed of all of Defendant's current or former non-exempt employees who worked in the United States at any time between December 11, 2021 and January 19, 2022.  (Doc. 31 ¶ 18; Doc. 45-1 at 3.)[4]  The TAC alleges that due to Defendant's "unlawful compensation practices," "[t]he FLSA Collective members were not paid at least the minimum wage for all hours worked" and "were not paid their full overtime premiums on time,[5] if at all, for all overtime hours worked," in violation of the FLSA.  (Doc. 31 ¶¶ 76-78, 84.)

A threshold matter raised by the parties' briefing is what to do with the supplemental facts and evidence that Defendant has now proffered.  There is a strong argument that the Court can simply ignore those facts at this stage of the case.  "At this early stage of the litigation, the district court's analysis is typically focused on a review of the pleadings but may sometimes be supplemented by declarations or limited other evidence."  *Campbell*, 903 F.3d at 1109.  *Campbell* noted that "Plaintiffs satisfy their 'burden' at the pleading stage with allegations that 'plausibly give rise to an entitlement to relief.'"  *Id.* at 1118-19.  Although *Campbell* did not specifically address the standard applicable to conditional certification motions, *id.* at 1118 ("Because preliminary certification is not challenged in

---

[4]     Although Plaintiff defined the collective slightly differently in the TAC (Doc. 31 ¶ 18) and in the proposed order granting its motion (Doc. 45-2), in both places identifying a different end date, Defendant asserted during oral argument that the Court should utilize the date limitation set forth above, which is derived from Plaintiff's proposed notice (Doc. 45-1 at 3), and Plaintiff agreed to the use of this verbiage.

[5]     As Plaintiff correctly notes in her reply, "under the FLSA wages are 'unpaid' unless they are paid on the employees' regular payday."  *Biggs v. Wilson*, 1 F.3d 1537, 1538 (9th Cir. 1993).  However, Defendant asserts that, under 29 C.F.R. § 778.106, an employer does not violate the FLSA by making a late overtime payment "where [the] correct amount of overtime compensation cannot be calculated until after the regular pay period and [the] employer pays as soon as practicable" and thus "[o]nly late payments despite time records could violate the FLSA."  (Doc. 39 at 8.)

this case, we address only the standard the district court should apply to post-discovery decertification."), its suggestion that the standard would be "loosely akin to a plausibility standard, commensurate with the stage of the proceedings," *id.* at 1109, suggests that the factual allegations in the TAC should be "accepted as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Luque v. AT & T Corp.*, 2010 WL 4807088, *3 (N.D. Cal. 2010) ("Courts *need not even consider* evidence provided by defendants at this stage."). Nevertheless, and as discussed in more detail below, even if the Court were to accept all of Defendant's supplemental facts here, such acceptance would not alter the conditional certification analysis.

On the merits, Defendant first argues that conditional certification should be denied because Plaintiff does not "allege a single, FLSA-violating policy." (Doc. 39 at 7-8.) Focusing first on whether there was a "single" policy, Defendant relies on its supplemental facts to assert that "there was no common plan that created liability as to all nonexempt employees"—rather, there was "a fluid, individualized approach that impacted employees in multiple ways." (*Id.* at 7.) This argument is unavailing. As noted, there is a strong argument under *Campbell* that a district court need not credit a defendant's version of the facts for purposes of a conditional certification motion. Alternatively, even if the Court were to credit Defendant's proffered facts—or construe Plaintiff's failure to contest those facts as conceding them—those facts would not undermine the existence of "a systemic policy" that was "no less common across the collective" even if "those subject to it [were] affected at different times, at different places, in different ways, or to different degrees." *Campbell*, 903 F.3d at 1116. Under Defendant's rendition of the facts, Defendant created a default rule of using estimates derived from an earlier pay period to pay its non-exempt employees during the outage but also encouraged such employees to submit payroll adjustment requests. That is still a systemic policy. Similarly, if Defendant made an assumption about the number of hours worked (rather than using historical data derived from pay period 24) as the default pay rate for employees hired after pay period 24, the overall policy remains systematic. All employees were subject to Defendant's policy,

albeit in "different ways" depending on when they were hired.

As for whether there was an "FLSA-violating" policy, Defendant argues that "even if Plaintiff's simplistic depiction of [Defendant's] response to the outage was accurate, she would still be missing one essential element: the common policy or plan employees were allegedly subject to must be *unlawful*." This appears to be a suggestion that, when resolving a motion for conditional certification, the Court must evaluate the merits of the plaintiff's theory of liability and determine whether the challenged conduct was, as a matter of law, unlawful. But such a determination is not necessary or proper at this stage. As noted, *Campbell* explains that "workers may litigate jointly if they (1) claim a violation of the FLSA, (2) are 'similarly situated,' and (3) affirmatively opt in to the joint litigation, in writing." *Campbell*, 903 F.3d at 1100. Elsewhere, *Campbell* states that "[p]reliminary certification . . . [is] conditioned on a preliminary determination that the collective as defined in the complaint satisfies the 'similarly situated' requirement." *Id.* at 1109. These passages suggest that a district court's inquiry at the conditional certification stage is limited to evaluating the plaintiff's showing as to the "similarly situated" prong. A district court need not, in contrast, separately evaluate the "claim a violation" prong, which is distinct.[6] Thus, it is sufficient for the complaint to "claim a violation of the FLSA" and, separately, to plausibly allege a common question of fact or law material to the disposition of the asserted FLSA violation. *See, e.g.*, *Loera v. Cnty. of Alameda*, 2023 WL 4551080, *5 (N.D. Cal. 2023) ("The defendant counters that the plaintiffs have not adequately alleged a common FLSA violation because [their allegations do] not point to an unlawful policy or practice . . . . But for purposes of this certification motion, the plaintiffs need only 'claim a violation of the FLSA' and show that they are 'similarly situated.' . . . The

---

[6]     During oral argument, Defendant suggested that *Campbell*'s passages regarding the conditional-certification process may be dicta because the issue in *Campbell* was whether the district court properly granted the defendant's decertification request. But even if the challenged passages could be characterized as dicta, they would remain binding on this Court. *See, e.g., United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) ("Where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense. . . . In other words, well-reasoned dicta is the law of the circuit . . . .") (cleaned up).

complaint claims an FLSA violation, and . . . the plaintiffs have plausibly shown that they 'were together the victims of a single decision, policy, or plan.'") (citations omitted). Here, the TAC alleges that Defendant violated the FLSA via the pay practices it adopted in the wake of the Kronos outage. (Doc. 31 ¶¶ 83-92.) Defendant, meanwhile, did not move to dismiss the TAC under Rule 12(b)(6), as it could have done if it believed the factual allegations in the TAC were insufficient to support a claim for FLSA liability, and instead filed an answer. (Doc. 38.) Thus, the "claim a violation" prong is satisfied.

*Senne* is not to the contrary.[7] There, the Ninth Circuit considered whether minor league baseball players who brought claims under the FLSA and state wage-and-hour laws could "properly bring their wage-and-hour claims on a collective and classwide basis." 934 F.3d at 923-24. The plaintiffs alleged that they were not paid at all during spring training, extended spring training, and "instructional leagues," and the parties disputed whether participation in those activities was mandatory. *Id.* The plaintiffs also alleged that during the championship season "they routinely work overtime, for which they are never compensated as a matter of policy." *Id.* at 924. After the district court conditionally certified the FLSA collective action, notice was sent to approximately 15,000 current and former players and more than 2,200 opted in. *Id.* The following year, the defendants moved to decertify the FLSA collective, and meanwhile the plaintiffs moved to certify Rule 23(b)(2) class actions for their state-law claims. *Id.* The district court—operating without the benefit of *Campbell*, which wasn't decided until 2018—decertified the FLSA collective and denied certification under Rule 23(b)(2), basing its decision on Rule 23 considerations. *Id.* at 924-25. On a motion for reconsideration that narrowed the collective, the district court—still without the benefit of *Campbell*—recertified the narrowed FLSA collective and certified the Rule 23(b)(2) class in part. *Id.* at 925-26.

The Ninth Circuit affirmed the district court's recertification of the FLSA collective, concluding that although the district court's analysis was "legally incorrect" in light of

---

[7]     In light of some of the points raised during oral argument, the Court has expanded upon the discussion of *Senne* that appeared in the tentative ruling.

*Campbell*, the district court nevertheless reached the right outcome because the new standard was "more lenient." *Id.* at 947-48 & n.28.  As for the plaintiffs' uncompensated work during spring training, extended spring training, and the instructional leagues, the court affirmed the recertification of the collective because "two common legal questions drive the litigation: are the players employees, and do the activities they perform during those times constitute compensable work?" *Id.* at 949.  The Ninth Circuit did not determine whether the nearly universal policy of not paying for this work was *unlawful*—it determined that whether it was unlawful was a shared material issue of law, meaning that the players were similarly situated. *Id.* ("As nearly all players are unpaid during these time periods, if the answers to those two questions are resolved in plaintiffs' favor, liability may be established by showing that the players performed *any* work.").  As for the overtime claims, the court affirmed the recertification of the collective, stating as follows:

> Critical to our decision is that plaintiffs allege a single, FLSA-violating policy—the failure to pay overtime under any circumstances—and argue a common theory of defendants' statutory violations: that defendants "suffer or permit" plaintiffs to perform compensable work before and after scheduled practice and game times.  These are "similar issue[s] of law or fact material to the disposition of their FLSA claims," thus making plaintiffs "similarly situated."

*Id.*

Here, Defendant seizes upon the phrase "single, FLSA-violating policy" to suggest that, before conditionally certifying the collective, the Court must find that the conduct alleged in the TAC was "unlawful."  (Doc. 39 at 8.)  The Court respectfully disagrees. *Senne* addressed the standard announced in *Campbell* and explained why, under the facts of that case and as to one particular claim, the *Campbell* standard was satisfied.  Unlike the minimum wage claims, where the shared question was whether the undisputed policy was lawful, the overtime claims boiled down to shared questions regarding whether the players had, in fact, worked overtime hours, where an obviously unlawful policy was alleged (*i.e.*, refusal to pay overtime "under any circumstances").  *Senne*, 934 F.3d at 949.  Thus, the Court does not construe *Senne*'s use of the phrase "single FLSA-violating policy" in the passage addressing the overtime claims as suggesting that the conditional certification

analysis involves (let alone requires) a determination of the merits. Again, all that is required for conditional certification is that the workers are similarly situated: "Preliminary certification . . . [is] conditioned on a preliminary determination that the collective as defined in the complaint satisfies the 'similarly situated' requirement of section 216(b)." *Campbell*, 903 F.3d at 1109. *See also Smith v. Akal Sec. Inc.*, 2019 WL 1932117, *4 (D. Ariz. 2019) ("Defendant's Response extensively argues the merits of the case, rather than focusing on the narrow issue before the Court. As noted above, the inquiry with this motion is limited, and at this stage, the Court does not review the underlying merits of the action."). Indeed, *Senne* confirms that "party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." 934 F.3d at 948 (quotation omitted). Accordingly, the existence of an unresolved dispute over whether Defendant's pay practices during the Kronos outage were "unlawful" does not serve as an impediment to conditional certification, as Defendant suggests, but rather underscores why the collective members are similarly situated.

Defendant also appears to assert that it is not enough for conditional certification purposes to have a systemic policy to which all members of the collective were subjected—there must also be proof that *all* members of the collective were subjected to FLSA violations. Defendant argues that Plaintiff cannot satisfy this alleged requirement here because, during the Kronos outage, "[n]early half" of its employees were "paid in full and on time." (Doc. 39 at 8.) But the "lenient" standard for conditional certification does not require a showing that every member of the collective will necessarily have a meritorious case. *Campbell*, 903 F.3d at 1109. Conditional certification exists only for the purpose of providing notice of the collective action. *Id.*

Defendant next argues that the Court should deny conditional certification because "Plaintiff fails to submit sufficient evidence that she is similarly situated to other members of the proposed collective." (Doc. 39 at 8-11.) In support of this point, Defendant cites *Rivera v. Saul Chevrolet, Inc.*, 2017 WL 3267540 (N.D. Cal. 2017). (*Id.* at 7.) However, *Rivera* predates *Campbell* and applied the "ad hoc" standard that the Ninth Circuit

disapproved in *Campbell*. *Rivera*, for example, faulted the plaintiff for "fail[ing] to provide sufficient evidence that Plaintiff and members of the putative collective action . . . have similar job responsibilities and pay structures." *Rivera*, 2017 WL 3267540 at *8.  But *Campbell* rejected that approach:

> In applying the ad hoc test . . . the district court emphasized that Officers worked on different tasks, in different divisions, and under different supervisors.  Those distinctions would not have mattered to the determination of liability if it were proven, as claimed, that the Department had an overall policy against submitting small overtime claims.  A systemic policy is no less common across the collective if those subject to it are affected at different times, at different places, in different ways, or to different degrees.

*Campbell*, 903 F.3d at 1116.  Simply put, *Campbell* holds that the alleged existence of a systematic policy to which all employees were subjected eliminates the need to scrutinize individual plaintiffs in search of differences.  To the extent Defendant offers arguments to the contrary (Doc. 39 at 11-15), they lack merit in light of *Campbell*'s holdings on this point.

Defendant also cites *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914 (D. Ariz. 2010), another pre-*Campbell* decision, for the proposition that Plaintiff "must provide the court with 'detailed allegations supported by declarations which successfully engage a defendant's affidavits to the contrary.'"  (Doc. 39 at 8-9.)  But *Campbell* once again forecloses that proposition.  *Campbell*, 903 F.3d at 1109 ("At this early stage of the litigation, the district court's analysis is typically focused on a review of the pleadings but may sometimes be supplemented by declarations or limited other evidence.  The level of consideration is lenient—sometimes articulated as requiring substantial allegations, sometimes as turning on a reasonable basis, but in any event loosely akin to a plausibility standard, commensurate with the stage of the proceedings.") (cleaned up).

Perhaps recognizing this point, Defendant argues in the alternative that even if "Plaintiff does not *have* to provide multiple declarations to support her motion," Plaintiff still must "make substantial allegations that she is similarly situated with the members of her proposed collective."  (Doc. 39 at 10.)  Upon reflection and with the benefit of the points raised by Defendant's counsel during oral argument, the Court has expanded the

discussion of this issue that appeared in the tentative ruling.

On the one hand, Defendant has identified reasons to question the substantiality of Plaintiff's allegations and evidence as to one particular issue—whether Defendant's challenged pay practices actually resulted in FLSA violations when applied to other employees beyond Plaintiff. Although the TAC explains, with specificity, why the application of the challenged practices caused *Plaintiff* to be paid less-than-minimum wages in violation of the FLSA, the TAC offers only conclusory allegations when it comes to why the application of these practices to other non-exempt employees also resulted in FLSA violations. For example, although the TAC alleges that "[m]any employees were . . . not paid for the non-overtime wages for hours worked in certain workweeks in which they worked over 40 hours" (Doc. 31 ¶ 42), the TAC does not identify any of these co-workers by name, provide any other details regarding the alleged overtime violations, or allege that these unspecified co-workers submitted evidence of their overtime hours in a manner that would enable Defendant to make timely overtime payments, as Defendant contends is required under 29 C.F.R. § 778.106. (Doc. 39 at 8.) Similarly, although the TAC alleges that "employees who were non-exempt were in many cases paid less than the hours they worked in the workweek, resulting in a failure to pay minimum wages" (Doc. 31 ¶ 41), it doesn't necessarily follow that paying an employee for "less than the hours they worked in the workweek" also results in a violation of the FLSA's minimum wage provisions. Take, for example, a hypothetical employee who earned an hourly wage of $25 and worked 20 hours in pay period 24. Pursuant to the challenged pay practices, Defendant would have paid that employee $500 for pay period 25 (*i.e.*, the hourly rate of $25 multiplied by an assumed 20-hour workweek). If that employee actually worked 40 hours during pay period 25, the $500 paycheck would have been too low, because the employee should have been paid $1,000 (*i.e.*, the hourly rate of $25 multiplied by 40 hours). However, that too-small payment would not have amounted to an *FLSA* minimum-wage violation. This is because the FLSA only requires the payment of a minimum wage of $7.25. *See* 29 U.S.C. § 206(a)(1)(C). Thus, so long as Defendant paid the hypothetical

employee at least $290 during pay period 25 (*i.e.*, the minimum wage of $7.25 multiplied by 40 hours), which Defendant would have done in the example above, there would be no FLSA minimum-wage liability. *See generally Rosen v. Fasttrak Foods LLC*, 2021 WL 3130333, *2 (D. Ariz. 2021) ("Rosen makes no effort to calculate the minimum wage she should have been paid under the FLSA . . . . Such minimum wages, to be clear, are not the same thing as Rosen's contractual rate of pay. . . . To calculate her damages under [the FLSA], Rosen would need to identify the actual number of hours she worked and multiply the figure by the applicable minimum wage."); *Rodriguez v. Capital Commercial Solutions, LLC*, 353 F. Supp. 3d 452, 462 (E.D. Va. 2017) ("[Plaintiff] claims he is owed his contracted rate of $ 18 per hour for the forty hours of regular work and $ 27 per hour for the sixteen hours of overtime, totaling $ 1,152, for this period. However, federal law provides a minimum wage of $ 7.25 per hour . . . . Thus, for each regular business hour worked, [Plaintiff] is entitled to payment at the rate of $ 7.25 per hour, totaling $ 290 ($ 7.25 x 40).").

The additional evidence that Plaintiff proffered in support of her certification motion does not add to the substantiality of Plaintiff's showing on this particular point. Although Plaintiff asserts in her declaration that, "[b]ased on discussions with my co-workers, my familiarity with [Defendant's] pay practices, and my observations and experiences, I know that most or all other nonexempt employees for [Defendant] who had to use the Kronos system had the same problems being timely and fully paid for the work we did, including minimum wage and overtime compensation" (Doc. 33-1 ¶ 16), Plaintiff's reliance on vague generalities in lieu of specific factual details is again conspicuous. Additionally, although declarations from other similarly situated employees are not, for the reasons discussed above, *required* at the conditional-certification stage, they can be useful when, as here, the plaintiff's own allegations are challenged as insubstantial.

On the other hand, the insubstantiality of Plaintiff's showing on this particular point—which, again, is the extent to which the application of Defendant's challenged pay practices to other members of the collective actually resulted in FLSA violations—is

ultimately a red herring.  As discussed at length in earlier sections of this order, Plaintiff simply needs to show that she and the other members of the collective "share a similar issue of law or fact material to the disposition of their FLSA claims."  *Campbell*, 903 F.3d at 1117.  By alleging and also providing evidence—much of it undisputed—that Defendant had a policy of estimating payroll and requiring employees to submit adjustment requests, the lawfulness of which is in question in this case, Plaintiff has met her "lenient" burden of demonstrating the propriety of conditional certification.  *Id.* at 1109.  Perhaps it will be revealed during later stages of this case that the challenged pay practices did not result in many (or any) FLSA violations beyond the minimum-wage violation to which Plaintiff was allegedly subjected, but that is not a reason to deny conditional certification.

For similar reasons, there is no merit to Defendant's argument that "[m]aterial factual and legal issues unique to each employee make proceeding as a collective infeasible."  (Doc. 39 at 11-14.)  Defendant contends that its "non-exempt employees are subject to myriad distinctions that make collective certification inappropriate," including that "many non-exempt employees were not paid late or underpaid at all during the outage" and that it intends to raise a "good-faith defense"—which, in turn, will control the availability of liquidated damages—that "may differ with respect to each employee based on several factors, including (1) which period(s) they were underpaid, (2) the reasons they were underpaid and the steps they took to take advantage of the systems [Defendant] put in place, (3) and when they were hired."  (*Id.*)  This marks another instance where Defendant's arguments, however forceful they may have been before 2018, are foreclosed by *Campbell*.  As noted, *Campbell* holds that "[i]f the party plaintiffs' factual or legal similarities *are* material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment," that "[a] systemic policy is no less common across the collective if those subject to it are affected at different times, at different places, in different ways, or to different degrees," and that "individualized damages calculations" are not "inherently inconsistent with a collective action."  *Id.* at 1114, 1117.

Defendant's final argument is that "[o]nly one other court has considered a motion

for conditional certification in the wake of the attack on Kronos, and the ruling supports [Defendant]." (Doc. 39 at 14.) The argument appears to be responsive to Plaintiff's observation that "at least one company-wide collective has already been certified in the wake of the Kronos outage," citing the same case, *Gaul v. Accura Health Ventures, LLC*, 2023 WL 312369 (S.D. Iowa 2023). (Doc. 33 at 10.) In an effort to show that *Gaul* actually supports its position, Defendant argues as follows:

> Gaul was a non-exempt employee of a healthcare provider in Iowa. She alleged that, when Kronos crashed, her employer estimated her pay instead of paying her for her actual hours worked, violating the FLSA. Unlike Plaintiff Robinson here, however, Gaul *actually submitted timely manual hours* from which proper overtime could have been calculated through "simple arithmetic." Ignoring these actual hours, the employer let its estimation process control, leaving the pay to even out in later periods. The court explained why, if Gaul had not timely submitted records, she might not be similarly situated to other employees. Indeed, it noted that without timely records Gaul's employer might have a strong good faith defense. But because the employer possessed timely records, the Gaul court granted conditional certification, based on an alleged common illegal practice not followed by [Defendant]: using estimates even after employees presented actual time records.

(Doc. 39 at 14, citations omitted.)

The Court reads *Gaul* differently. There, there were apparently two different groups, Payroll Group A and Payroll Group B. *Gaul*, 2023 WL 312369 at *8. Although the employer used November 2021 data to estimate the number of hours worked by employees in Payroll Group A during the Kronos outage, it did not do so for employees in Payroll Group B. *Id.* The named plaintiff had "received a promotion just as the Kronos outage occurred and therefore was entitled to pay at a higher overtime rate in December than she received in November." *Id.* at *7. The court expressed "doubts about whether an employee for whom November data is used to estimate the number of *hours worked* is similarly situated to those for whom November data is used the estimate the *rate of pay*" but nevertheless concluded that they were. *Id.* at *8. The court emphasized that, despite "the idiosyncratic features of Gaul's situation," she had done enough to "satisf[y] her minimal burden" at the conditional-certification stage, but the court also noted that "[w]hether Gaul can survive the more stringent burden of proving certification down the

1    road is, of course, a very different question." *Id.*  That analysis does not support denying

2    conditional certification here.[8]

3         *Thornton v. Tyson Foods, Inc.*, 2023 WL 4712035 (W.D. Ark. 2023), the case the

4    parties discuss in their supplemental briefs (Docs. 52, 53), is another recent decision in

5    which a court granted a conditional certification request in an FLSA action filed in the

6    aftermath of the Kronos outage.[9]  Of course, *Thornton* is not binding here, as it is a district

7    court decision that does not apply Ninth Circuit law.  Nevertheless, *Thornton*'s conclusion

8    that "[b]ecause all non-exempt employees at Tyson were similarly affected by the Kronos

9    hack, judicial efficiency would be promoted by litigating their claims together on a

10   nationwide-basis" (*id.* at *4), is consistent with the Court's determination that the FLSA

11   collective members here are similarly situated.  Although *judicial* efficiency is not part of

12   the equation in this circuit, efficiency still matters to the extent it benefits the plaintiffs.

13   *Campbell*, 903 F.3d at 1115-16 ("[I]f the party plaintiffs' FLSA right to choose collective

14   litigation has any force, 'procedural considerations' must mean more than the

15   inconvenience, from the court's or defendant's viewpoint, of the party plaintiffs' choice.");

16   *id.* at 1119 ("The collective mechanism is meant to ensure that party plaintiffs have the

17   option of benefitting from the efficiencies of collective litigation—including, in cases

---

[8]    The discussion in *Gaul* about "simple arithmetic" was not part of the court's "similarly situated" analysis.  That part of the order addressed (and denied) the defendant's summary judgment motion, in part because "it was not 'impracticable' as a matter of law for [the defendant] to determine the correct amount of overtime compensation in a timely manner"—it could be done by "implement[ing] a manual timesheet system to track hours," such that "[n]o estimates were required" and calculating pay "was a matter of simple arithmetic."  2023 WL 312369 at *7.

[9]    Defendant's assertion that the court "actually *denied* the class sought" in *Thornton* is wrong.  During the briefing process, the plaintiff voluntarily limited her proposed collective.  *Thornton*, 2023 WL 4712035 at *5.  The court never discussed whether it would have certified the collective anyhow, without this voluntary limitation, and certainly did not deny any proposed collective.  Indeed, the limitation did not factor into the court's analysis in any meaningful way and was mentioned only as an aside, to bolster the decision the court reached for other reasons.  *Id.* ("It is undisputed that Tyson's policy to duplicate the December 4 pay period for the December 11 pay period was a uniform, company-wide policy, as were the company's policies to manually track hours during the remainder of the hack and reconcile pay on a 'net' basis, rather than pay period by pay period.  Tyson's non-exempt employees were affected by these policies in similar ways, particularly now that Thornton has limited her proposed collective to only those non-exempt employees who worked at least 40 hours during the hack.").

1    presenting genuine disputes of material fact, collective access to trial.").

2    IV.    The Notice

3            In the alternative, Defendant argues that if the Court conditionally certifies the

4    collective, it "should modify the notice content and procedures that Plaintiff proposes" to

5    (1) "accurately describe the Court's role, dates of eligibility, recipient options, the nature

6    of the allegations, and [Defendant's] position"; (2) limit the means of sending notice to

7    mail and email only, rather than permitting notice via text messaging or phone calls; and

8    (3) limit the production of employee contact information to mailing and email addresses.

9    (Doc. 39 at 14-18.)  One of the "recipient options" Defendant proposes is the option "to

10   retain different legal counsel."  (*Id.* at 17.)

11           In reply, Plaintiff "disagrees that any of [Defendant's] requested changes to the

12   proposed notice are necessary or warranted," but "in order to avoid dispute or delay,"

13   Plaintiff does not oppose most of Defendant's modification requests.  (Doc. 45 at 10.)  For

14   example, Plaintiff "agrees to compromise and limit" the notice methods to mail and email.

15   (*Id.* at 9.)  Additionally, although Plaintiff does not directly respond to Defendant's request

16   to limit the production of employee contact information to mailing and email addresses,

17   Plaintiff's brief implies concession on this point.  (*Id.*)

18           Plaintiff only appears to oppose two of Defendant's modification requests.  First, in

19   response to Defendant's contention that "the Notice should not refer to unpaid wages where

20   there is no allegation of such a violation" and instead should refer to "late payments

21   following the ransomware attack on Kronos" (Doc. 39 at 16), Plaintiff acknowledges that

22   the "language describing the claims in the lawsuit [should be] adjusted to include

23   'untimely,' as well as 'unpaid,' wages" but does not agree to remove the word "unpaid,"

24   in part because she "does not agree all unpaid wages have yet been paid."  (Doc. 45 at 10

25   & n.7.)  The Court agrees with Plaintiff on this point.  Although the Court understands

26   Defendant's position that any late wage payments have now been rectified, that is not

27   Plaintiff's position.  The notice should accurately reflect Plaintiff's position in this action,

28

even if her position is factually and legally disputed.[10]

The second dispute concerns the section of Plaintiff's proposed notice that falls under the heading "What are your options?" (Doc. 33-7 at 4.) In Plaintiff's proposed notice, one of the identified options is "Join the lawsuit," and immediately underneath that option is an explanation of how to fill out and send the attached consent form to the law firm that represents Plaintiff. (*Id.*) According to Defendant, this section of the notice should be changed to include the following: "If you join the lawsuit, you may choose to be represented by the attorneys below or you may choose to retain different legal counsel. If you choose to retain your own counsel, they will file your notice. If you choose to be represented by the attorneys below, you can return your consent form in one of these ways . . . ." (Doc. 39-3 at 2.) Defendant also identifies a recent case in which another judge in the District of Arizona approved such an amendment. (Doc. 39 at 16.) In reply, Plaintiff argues that Defendant's "proposed invitation to invite more plaintiff lawyers into this lawsuit is . . . completely unworkable," cites a variety of cases in which courts rejected similar amendment requests, and notes that her proposed notice already "lets potential plaintiffs know they can seek different counsel and pursue their own claim in a separate proceeding." (Doc. 45 at 10-11.)

Defendant has the better side of this argument. As another judge of this court recently (and, in the Court's view, correctly) observed, "Plaintiffs' proposed notice would leave potential class members with two options in the event they want to bring a case against Defendants; they can either opt-in and use Plaintiffs' counsel or opt-out and bring a separate lawsuit. However, these are not the only options available to putative class members under the FLSA. Putative class members may choose to opt-in and hire their

---

[10] During oral argument, Defendant also argued that the term "wages" in the notice is imprecise, because the FLSA only applies to minimum wages and overtime wages, and suggested that Plaintiff's phrasing may cause recipients to conclude, mistakenly, that they also have a claim for unpaid regular wages. In response, Plaintiff offered several justifications for the language as written. For the time being, the Court is satisfied that Plaintiff's proposed phrasing represents a fair shorthand for the claims at issue in this case. By so concluding, the Court does not mean to suggest that it has prejudged any future substantive dispute over the categories of potential damages.

own lawyer." *Lopez v. PT Noodles Holdings Inc.*, 2021 WL 2576912, *7 (D. Ariz. 2021). Nor is the Court persuaded by the concern that some courts have expressed when denying similar amendment requests, which is that confusion and inefficiency would flow from allowing opt-in plaintiffs in a collective action to retain their own counsel. Not only is that concern speculative and hypothetical, but the Court cannot see how efficiency concerns could override the need to provide potential opt-in plaintiffs with accurate, complete information about their rights. *Campbell*, 903 F.3d at 1100 (one of the "permutations" of the statutory right to participate in a collective action is "the right of any employee to become a party plaintiff to any such action").[11]

Because Plaintiff agreed to (or did not dispute) Defendant's other requested modifications, all disputes surrounding the notice procedures and content have been resolved. The Court authorizes the notice and other procedures as outlined in and appended to Plaintiff's reply brief, with the exception that Defendant's proposed representation-related language must be added.

Accordingly,

**IT IS ORDERED** that Plaintiff's conditional certification motion (Doc. 33) is **granted**. The collective, as defined in this order, is conditionally certified, and notice may be provided as set forth in this order.

Dated this 30th day of September, 2023.

Dominic W. Lanza
United States District Judge

---

[11] During oral argument, Plaintiff noted that a different section of her proposed notice already explains that, in lieu of choosing to be represented by Plaintiff's counsel, an opt-in plaintiff "can obtain counsel of your own choosing (at your own expense), who can file your Notice of Consent with the Court." (Doc. 45-1 at 4.) The Court appreciates this clarification but cannot see how it helps Plaintiff's position. If Plaintiff agrees that the notice should advise opt-in plaintiffs of their right to proceed in this case via separate counsel (which seems contrary to the position raised in Plaintiff's reply, which was that advising opt-in plaintiffs of that right would create inefficient chaos), the Court sees no harm in also including that advisement in the section of the notice entitled "What are my options?" as Defendant proposes.